# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RHONDA DENISE THORNTON, ) | |
| ) | Civil No. 3:13-cv-1558 CSH |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN. ACTING ) | |
| COMMISSIONER OF SOCIAL ) | **FEBRUARY 9, 2016** |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## RULINGS ON PLAINTIFF'S MOTION TO REVERSE COMMISSIONER'S DECISION, AND DEFENDANT'S CROSS-MOTION TO AFFIRM COMMISSIONER'S DECISION

**HAIGHT, Senior District Judge:**

Plaintiff Rhonda Denise Thornton applied to the Social Security Administration for disability benefits and supplemental security income. The Administration denied Thornton's applications in a written decision (Jane A. Crawford, *Administrative Law Judge*) which the Defendant Commissioner declined to disturb on appeal.

Thornton brings this action under § 205(g) of the Social Security Act as amended, 42 U.S.C. 405(g), in order to obtain a review by the Court of the Commissioner's final decision denying her applications for benefits. Thornton now moves [Doc. 11] for an order reversing the Commissioner's decision. The Commissioner cross-moves [Doc. 17] for an order affirming that decision. This Ruling resolves the motions.

1

# I

## BACKGROUND

Thornton filed her applications for benefits on June 14, 2010. She alleged disability beginning on May 3, 2010. Thornton was born on September 1, 1967, and so was 44 years old at the time of her applications.

Thornton's applications for disability benefits were based on the contention that she is disabled by systemic lupus erythematosus ("lupus" or "SLE"). In her decision denying benefits at 4, ALJ Crawford found that Thornton has the "severe impairment" of "systemic lupus erythematosus." The phrase "severe impairment," as used by the ALJ in her opinion, is of central import in Social Security Act analysis because the regulations propounded under the Act require an ALJ, when deciding an individual's eligibility for benefits, to determine at one step in the five-step process[1] whether the claimant has a medically determinable impairment or a combination of impairments that is "severe." 20 C.F.R. §§ 404.1521 and 416.920(c).

"An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." ALJ Crawford's decision at 2 (citing regulations). The regulations list lupus under the caption "Immune System disorders," 20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.00, and define the disease in sobering terms, § 14.00(D)(1): "Systemic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system." Claims of disability caused by lupus form the subject matter of numerous lawsuits filed under the Social Security Act. *See Borgos-Hansen v.*

---

[1] The familiar five-step disability evaluation process is described by the Second Circuit in *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

*Colvin*, 109 F. Supp.3d 509, 514 (D. Conn. 2015) (collecting cases).

The administrative record ("AR.") before the ALJ in this case includes reports of two office visits, on March 4 and June 3, 2010, Thornton had with Aryeh M. Abeles, M.D., an attending rheumatologist at the University of Connecticut Health Center.  The reports signed by Dr. Abeles, AR. 289 and AR. 291, each state "This is a followup appointment," but the record does not include records of earlier  office visits by Thornton to this facility.  Dr. Abeles' June 3, 2010 report describes Thornton as "this 42-year-old woman with lupus characterized by positive antinuclear skin rashes, and strongly positive autoantibodies (Ro, Smith, and RNP antibodies)."  AR 289. Under the caption "Impression," Dr. Abeles states in part: "Ms. Thornton is a 42-year old woman with systemic lupus erythematosus."  The record does not show when Thornton was first diagnosed with SLE.  It is apparent that she was suffering from that disease in March 2010, when she consulted Dr. Abeles, and had been for some time previous to that.

As noted, the ALJ's decision, which is dated March 26, 2012, found that Thornton had the severe impairments" of "systemic lupus erythematosus." AR. 15.  However, the ALJ concluded that Thornton was not disabled, and consequently not entitled to disability benefits.  The ALJ found that Thornton's impairment did not equal the severity of one of the listed impairments in the regulations that would if present mandate a finding of disability, AR. 17, and also found that Thornton had a residual functional capacity to perform "light work" of an exertional nature, as that phrase is defined in the regulations, AR. 18.  The ALJ further found: "Although the claimant is capable of performing past relevant work [that is, gainful work of the sort she had performed previously], there are other jobs existing in the national economy that she is also able to perform." AR. 22.  Given those findings, the ALJ reached the conclusion mandated by the statutory and regulatory scheme that

Thornton was not "disabled," and consequently was not entitled to Social Security Act benefits.  On administrative appeal, the Commissioner affirmed the ALJ's decision.  This action followed.

Thornton appeals to this Court on the ground that in order to reach that unfavorable decision, it was necessary for the ALJ to disregard the contrary opinion of Thornton's primary care physician, Michael B. Teiger, M.D.  There is no question that Dr. Teiger played that central role in Thornton's care;  the  ALJ's decision refers to Dr. Teiger as Thornton's "primary care physician."  AR. 18.

The medical records generated by Dr. Teiger during his care of Thornton, AR. 314-331, include office visit reports, lab results, and medical impressions and opinions.  The period of care reflected by these records is from March 13, 2009 to September 9, 2011.  The first of these documents, AR. 314, appears to be a form Dr. Teiger completed concerning an office visit Thornton made on March 13, 2009.  AR. 315-318 are laboratory results based on a urine sample Thornton gave during that visit.  Dr. Teiger's report on an office visit with Thornton on August 26, 2010, records his Impression: "Lupus is stable."  Dr. Treiger's records presented to the ALJ do not reveal whether March 13, 2009 was the first time Thornton consulted Dr. Teiger, or when during Dr. Teiger's care of Thornton he first made or confirmed the diagnosis that she had lupus.  As noted *supra*, on the occasion of a June 3, 2010 office visit, Dr. Abeles of the UConn Health Center described Thornton as "a 42-year old woman with systemic lupus erythematosus."

The most recent pertinent document in Dr. Teiger's records is a medical opinion Dr. Teiger expressed, with which the appeal to this Court is principally concerned.  That opinion takes the form of Dr. Teiger completing and signing a six-page written statement, AR. 326-331, captioned "MEDICAL SOURCE STATEMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL)."  The statement refers at the outset to "Rhonda Denise Thornton" and instructs the

4

"medical source" involved (here, Dr. Teiger): "To determine this individual's ability to do work-related activities on a regular and continuous basis, please give us your opinion for each activity shown below."  Dr. Teiger complied by checking boxes on the form, adding comments at various places, writing an opinion in response to the request that he "identify the particular medical findings" which "support your assessment or any limitations and why the findings support the assessment," dating the form on February 20, 2012, and signing it.

Dr. Teiger's responses to this statement need not be recounted in full.  It is sufficient for present purposes to say that Dr. Teiger's opinions, expressed in his answers to the form he completed, cannot be reconciled with the ALJ's subsequent finding that Thornton was capable of light exertional work.  Dr. Teiger's basic opinion is that Thornton's lupus symptoms preclude her from engaging the sort of work the ALJ later decided she could perform.  In a letter to the ALJ dated February 28, 2012,  AR. 272, Mr. Grabow, counsel for Thornton, stressed the physical limitations diagnosed by Dr. Teiger:

> I am attaching hereto a MSS – physical completed by Dr. Michael Teiger, the claimant's primary care physician.  I note that Dr. Teiger opines that the claimant retains only a part-time, or less than sedentary, work capacity secondary to systemic lupus.  I further note that the claimant's treater opines in section II.A., that the claimant would be unable to report to work 4 or more times a month as a result of her medical condition.

Mr. Grabow read Dr. Teiger's February 20, 2012 opinions as stating that Thornton was disabled by her lupus, within the statutory and regulatory scheme.  There is no other way to read it.  That is why Mr. Grabow sent Dr. Teiger's opinions to ALJ Crawford, with the request in his February 28 letter that "Dr. Teiger's opinions be afforded substantial or controlling weight."

ALJ Crawford received Dr. Teiger's opinion, read and considered it, acknowledged its

5

import, and then, rejecting counsel's submission, decided to give Dr. Treiger's opinion no weight on the issue of disability *vel non*. The following passages in the ALJ's decision reveal her reasoning on the point:

> In a February 20, 2012 Medical Resource Statement, Dr. Teiger reported that the claimant is limited due to lupus symptoms, primarily with her vision and joint pain. . . . The undersigned affords little weight to the findings of the claimants primary care physician, Dr. Michael Teiger, as it is inconsistent with the objective medical evidence. Dr. Teiger proffered his opinion on February 20, 2012 without any current supporting treatment notes to bolster his opinion. The most recent treatment notes from his office dated September 9, 2011, show that the claimant was in no acute distress and had no clubbing, cyaosis or edema of her extremities, had intact peripheral pulses, and was intact neurologically. He continued the claimant on the same medication regimen, which suggests that the medications were effective in controlling her symptoms and if she was experiencing any side effects, they were not severe enough for him to make any changes or adjustment. There is no evidence in the medical records to support the exertional, postural manipulative and visual limitations he ascribed to the claimant. On the other hand, the undersigned affords great weight to treating opthalmologist Dr. Barry Kels, who found that the claimant did not present with a vision loss that impacted her work related abilities. Unlike Dr. Teiger, Dr. Kels has expertise in the field of ophthalmology and is adequately qualified to make an assessment of the claimant's visual abilities and limitations, which renders his opinion more persuasive.

AR 20, 21. The ALJ's averment that she afforded "little weight" to Dr. Teiger's opinions and findings is an exercise in *politesse.* In reality, the ALJ entirely disregarded Dr. Teiger's opinion that Thornton was disabled by lupus symptoms.

On her appeal to this Court, Thornton's brief [Doc. 11-1] contends principally that the ALJ failed improperly to give appropriate weight to the opinion of Dr. Teiger, the treating physician, and that the case should be remanded to the Commissioner in order to develop the record, by which counsel means that the ALJ "should have sought clarification from the claimant's treating source,

Dr. Teiger." Brief at 7.  That is the alternative form of relief Thornton seeks in her concluding prayer, that the Commissioner's denial of benefits be "reversed and/or remanded."  *Id*. at 9.

The Commissioner, on her cross-motion, contends that the denial should be affirmed because the ALJ's decision is supported by substantial evidence on the present record, and there is no occasion for a remand.

## II

## DISCUSSION

The effect of a treating physician's medical opinion upon the Social Security Administration's determination of whether an individual is "disabled" is a complex question, with which judges and regulators have wrestled.

On the one hand, a *treating* physician is trained in medicine and has cared for – *treated* – the individual in question.  The professional relationship between patient and physician is sometimes enhanced by the personal bond of friendship.  One need not surrender to cynicism in order to suppose that on occasion a physician may phrase a medical opinion in a manner intended to improve a patient-friend's prospects of obtaining disability benefits.  As the regulations and judicial decisions have evolved, it is clear that a treating physician's opinion that the individual claimant is disabled is not always binding upon an administrative law judge, whose responsibility under the statutory and regulatory scheme is to determine whether or not that is so.

On the other hand, a "treating physician" qualifies for that designation by caring for the individual over time, either by the general practice of medicine or for a particular malady.  In a gentler and less complicated day, we called the first such doctor a "general practitioner" or "GP," whose place in our lives conjured up Norman Rockwell covers on *The Saturday Evening Post*.

These physicians are now called "internists,"[2] and today their place in our lives is conveyed by the bureaucratic phrase "primary care physician."  The second such doctor was and is still called a "specialist," and if an individual's medical problems are limited to a single malady or condition, the treating specialist will also be the primary care physician.

For purposes of the case at bar, the important characteristic of a disability benefits claimant's primary care physician, internist or specialist, is that this physician has actually *treated* the benefits claimant who is also the doctor's patient.  Typically, the physician has examined the patient at intervals; taken the patient's oral history; ordered tests, examined the test results, and discussed them with the patient; prescribed medication for the patient; conferred with the patient from time to time; recommended (or performed) surgery on the patient if required.  In these personalized respects, a treating physician stands in stark contrast to a physician, frequently encountered in these cases, who is retained to opine on an individual's claim of disability, and does so solely upon medical records, without having ever seen the individual, let alone examined the individual or prescribed or carried out any form of medical treatment.

The Second Circuit has addressed these differing circumstances in a series of decisions which establish the "treating physician rule."  The rule requires a Social Security Administration ALJ to give significant deference to the opinion of a treating physician.  That deference is also articulated in revised regulations the SSA issued in 1991.  I have had occasion to consider the treating physician rule in  *Borgos-Hansen*, 109 F. Supp.3d 509, and *Leroy v. Colvin*, 84 F. Supp.3d 124 (D.Conn. 2015), which review Second Circuit jurisprudence on the subject.

---

[2]  Doctors who care for patients achieving a certain level of seniority are increasingly called "geriatricians."

When a treating physician fills out and signs the sort of questionnaire that Dr. Teiger completed in the case at bar, the physician is expressing a medical opinion, notwithstanding the questionnaire's provenance and purpose.  In *Borgos-Hansen*,109 F. Supp.3d at 516, I said: "These questionnaires, prepared by an attorney representing a client claiming social security benefits, resemble the true-false section of a bar examination rather than the essay section.  Nonetheless, the questions themselves are straightforward and do not suggest desired answers.  A physician who checks one box or another is, by that action, expressing a medical opinion."

Authority for that view is found in Judge Cabranes's opinion in *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998), where the disability claimant submitted to the ALJ "a questionnaire completed by Dr. Mark Jobson, who apparently began treating her at the Mid-Hudson clinic on October 29, 1992.  Dr. Jobson completed this questionnaire on May 28, 1993.  The questionnaire consisted of a series of questions, followed by spaces for 'yes' or 'no' check marks."  *Id.* at 499.  Judge Cabranes described the manner in which questionnaire performs its function:

> By checking "yes" on the form Dr. Jobson indicated that plaintiff was disabled based on objective medical findings, that she would have trouble working six hours per day without intermittent breaks, that she would have to alternate between sitting and standing, and that it would be reasonable to expect that her symptoms would result in frequent absences from the workplace. By checking "no" he indicated that she would not have to lie down and rest during an eight–hour work day and that there was no manifestation of "increased nervousness, depression or anxiety."

*Id*. at 500.  The Second Circuit in *Schaal* clearly regarded Dr. Jobson's completion of the questionnaire as the expression of a medical opinion by a treating physician.  The court of appeals rejected the ALJ's contention that "the questionnaire completed by Dr. Jobson 'is not a statement of the treating physician that is binding on me because of the lack of clinical findings to support these

conclusions,'" *id.* at 504, and held that "the Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error," *id.* at 505.

By the same token, in the case at bar, the manner in which Dr. Teiger completed the questionnaire counsel presented to him constitutes the expression of medical opinions by a treating physician. Dr. Teiger's ultimate opinion, as both parties recognize, is that Thornton was disabled by symptoms of lupus.

In *Schaal* the Second Circuit also said: "Prior to 1991, our case law established a so-called 'treating physician rule' giving substantial weight to the treating physician's opinion as against other medical evidence." *Id.* at 503. In 1991, the Social Security Administration promulgated new Regulations setting forth criteria for weighing treating physician opinions in disability cases. *See* 56 Fed. Reg. 36,932 (1991) ("the 1991 Regulations"). *Schaal* acknowledged that the 1991 Regulations "'accord[ed] less deference to unsupported treating physician's opinions' than did our previous case law," *id.* at 503 (citing and quoting *Schisler v. Sullivan*, 3 F.3d 563 (2d Cir. 1993)), which addressed the question in greater detail:

> The regulations resemble but also differ from our treating physician rule in various ways. For example, like our rule, the opinions of treating physicians are accorded more weight than those of non-treating physicians. However, by granting the treating physician's opinion "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the regulations accord less deference to unsupported treating physician's opinions than do our decisions."

3 F.3d at 567. But the differences between the 1991 Regulations and the Second Circuit's prior treating physician rule did not persuade the court of appeals that the regulations were invalid. Judge

Winter's  opinion in *Schisler* reasons:

> We believe that the regulations are reasonable and not arbitrary, capricious or manifestly contrary to the statute. . . .  They continue to give deference to the opinions of treating physicians based on the view that opinions based on a patient-physician relationship are more reliable than opinions based, say, solely on an examination for purposes of the disability proceedings themselves.  The requirement that such opinions be "well-supported" by clinical or laboratory diagnostic techniques to receive "controlling weight" departs from our rule but is not unreasonable.

*Id*. at 568 (internal quotation omitted).

The regulations go on to provide that in a case where "we do not give the treating source's opinion controlling weight," the agency applies various factors "in determining the weight to be given the opinion."   In *Schaal,* the Second Circuit emphasized the 1991 Regulations' additional provision that the Commissioner "will always give good reasons in our notice of determination or decision for whatever weight we give [claimant's] treating source's opinion."  134 F.3d at 503-504 (quoting the Regulations).

### III

In the case at bar, the ALJ undertook to explain the reasons why she gave no weight to the treating physician's opinion that Thornton was disabled.   Those reasons, quoted *supra,* are in substance that Dr. Teiger's treatment notes did not "bolster his opinion"; he continued Thornton on the same medication regimen without side effects; and "there is no evidence in the medical records" to support the "limitations he ascribed to the claimant."  This reasoning is preceded by the ALJ's notation that "her primary care physician, Dr. Teiger, found that her lupus was stable."  A.R. 20.

This reasoning may be logical, but it is also a lay person's evaluation of a physician's medical opinion on the basis of what medical records say or do not say.  That is problematic under Second

Circuit authority.

In *Rosa v. Callahan*, 168 F.3d 72 (2d Cir. 1999), where the Second Circuit vacated the Commissioner's denial of benefits and remanded the case, Circuit Judge Sotomayor (as she then was) said:

> In analyzing a physician's report, the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. A circumstantial critique by a non-physician, however thorough or responsible, must be overwhelmingly compelling to justify a denial of benefits.

*Id.* at 79 (citations, alterations, and internal quotation marks omitted). The ALJ in *Rosa* refused to accept the opinion of the treating physician, Dr. Ergas, that the claimant was disabled, for the reason given by the ALJ that Dr. Ergas "did not report findings of muscle spasm to corroborate any loss of motion." *Id*. That criticism is echoed in the case at bar by the ALJ's comment that "there is no evidence in the medical records to support" the limitations Dr. Teiger ascribed to Thornton. Judge Sotomayor's opinion in *Rosa* gives short shrift to that sort of reasoning by an ALJ:

> Indeed, as a lay person, the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by Dr. Ergas in his assessment. Accordingly, we find nothing so "overwhelmingly compelling" in the ALJ's critique of Dr. Ergas's findings as to permit the Commissioner to "overcome" an otherwise valid medical opinion.

168 F.3d at 79 (citation, alteration, and footnote omitted).

Moreover, in *Schaal*, where the ALJ rejected a treating physician's opinion that the claimant was disabled "because of the lack of clinical findings to support these conclusions," Judge Cabranes's opinion ordering remand observed that "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. Jobson *sua sponte*." 134 F.3d at 504-505. In *Rosa*, Judge Sotomayor's opinion quotes that language from *Schaal*, and expands upon it:

12

> If an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears *an affirmative duty* to seek out more information from the treating physician and to develop the administrative record accordingly.  In fact, where there are deficiencies in the record, an ALJ is under *an affirmative obligation* to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal.  It is the rule in our circuit that the ALJ, unlike a judge in a trial, must herself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.

168 F.3d at 79 (some citations, alterations, and internal quotation marks omitted) (emphases added).  Because a benefits proceeding such as the one at bar is non-adversarial, the discharge of an ALJ's duty must be even-handed and balanced.  In *Sims v. Apfel*, 530 U.S. 103 (2000), the Supreme Court stressed that "It is the ALJ's duty to investigate the facts and develop the arguments *both for and against* granting benefits."  *Id.* at 111 (emphasis added).

In the case at bar, the ALJ decided to disregard a treating physician's medical opinion that Thornton was disabled because, in the ALJ's lay view, the medical records did not support that medical opinion.  This runs counter to Second Circuit authority, which disapproves of a non-physician ALJ substituting his or her lay judgment, based upon such a circumstantial critique, for competent medical opinion.

The most that can be said about the circumstance relied upon by the ALJ in this case, that "there is no evidence in the medical records to support" Dr. Teigar's "limitations ascribed to the claimant" and his resulting opinion of disability, is that there were inconsistencies in the physician's reports.  Under the Second Circuit cases cited *supra*, that circumstance imposed upon the ALJ the affirmative duty to develop the administrative record by interviewing Dr. Teiger about the contents of his records, reports and opinions, with particular reference to whether the treatment records precluded an opinion of disability.  In *Rosa*, the Second Circuit included in its order for remand the

direction that the Commissioner:  "Request an explanation from Dr. Ergas [the treating physician] supporting his diagnosis of total disability."  168 F.3d at 83.  That is the exercise I required on remand in *Borgos-Hansen*, 109 F. Supp.3d at 531:

> ALJ Thomas is saying in his decision that [treating physician] Dr. Memet's opinion on plaintiff's disability is not supported by (and by extension is contrary to) all the medical evidence in the case, including that evidence produced by Dr. Memet's own treatment.  The ALJ's conclusion may be correct.  It may be immune from challenge. But the Court is not in a position to leave the ALJ's denial of disability benefits intact until a gap in the administrative record is filled.  That gap is the result of the ALJ's failure to ask Dr. Memet to explain her opinion in the light of the other medical evidence.  If on remand the inquiry is put to Dr. Memet, in words or substance, "Is your opinion that this patient is disabled supported by the medical records," she will presumably either say "yes" and explain why (with references to the record), or she will acknowledge that the records do not support and may even be contrary to her opinion, coupled with an explanation (if she is so minded) of why she adheres to her opinion nonetheless.

The direction on remand that I made in *Borgos-Hansen*, and make in the case at bar, echoes the Second Circuit's directions in *Rosa* and in *Schaal*, 134 F.3d at 505, where the Second Circuit said: "the proper course is to direct that this case be remanded to the SSA to allow the ALJ to reweigh the evidence pursuant to the 1991 Regulations, developing the record as may be needed."

After this development of the record has been accomplished, together with any further development that the ALJ may deem advisable in addition to inquiries addressed to Dr. Teiger, the ALJ will again decide whether Thornton is disabled.  As the Second Circuit recognized in *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), "some kinds of findings – including the ultimate finding of whether a claimant is disabled and cannot work – are reserved to the Commissioner. . . . [T]he Social Security Administration considers the data that physicians provide but draws its own

14

conclusions as to whether those data indicate disability."  To that declaration, the Second Circuit

added in *Snell*: "Reserving the ultimate issue of disability to the Commissioner relieves the Social

Security Administration of having to credit a doctor's finding of disability, but it does not exempt

administrative decisionmakers from their obligation, under *Schaal* and § 404.1527(d)(2), to explain

why a treating physician's opinions are not being credited," for the reason that, as Judge Calabresi's

opinion in *Snell* explains, "[a] claimant like Snell, who knows that her physician has deemed her

disabled, might be especially bewildered when told by an administrative bureaucracy that she is not,

unless some reason for the agency's decision is supplied."  177 F.3d at 134.  A claimant "is not

entitled to have Dr. Cooley's [her treating physician's] opinion . . . be treated as controlling, but she

is entitled to be told why the Commissioner has decided – as under appropriate circumstances is his

right – to disagree with Dr. Cooley." *Id.*.  As the Second Circuit stressed in *Schaal*, the SSA

implemented that salutary policy by including in the 1991 Regulations the promise that the

Commissioner "will always give good reasons in our notice of determination or decision for

whatever weight we give [claimant's] treating source opinion."  134 F.3d at 503-04 (internal

quotation omitted)

Not just reasons, but *good* reasons, which means at the least reasons which do not run counter

to Second Circuit decisions.  A district court reviewing a denial of disability benefits must consider

whether an ALJ's explanation for disregarding a treating physician's opinion on disability is sufficient

and permissible under appellate authority.  In *Rosa*, the Second Circuit remanded a denial of

benefits, where the ALJ erred in giving no weight to a treating physician's opinion of disability

because the ALJ thought that opinion was insufficiently supported by the medical records.  The ALJ

in the case at bar, whose hard and conscientious work is manifested by her detailed decision,

nonetheless committed the same error.  A remand is required by Second Circuit precedent.

## IV

Two additional points should be made about the ALJ's explanation for rejecting the treating physician's opinion that Thornton was disabled by lupus (a condition the ALJ agrees Thornton had).

*First*:  Point III of this Ruling concludes that there is a gap in the administrative record which requires a remand to the Commissioner.  That conclusion is not altered by Dr. Teiger's notation in one of his treatment records: "Impression: Lupus is stable."  A.R. 323 (progress notes of Thornton's office visit on August 26, 2010).

The ALJ's decision at A.R. 20 refers to that clinical notation and regards it as evidence that Thornton was not disabled.  The validity of that proposition depends, to paraphrase a present-day politician, upon what the definition of "stable" is.  The ALJ seems to construe "stable" as precluding "disabled" – that is to say, an individual whose medical condition is *stable* cannot be *disabled* by that condition.  This construction may appeal to English majors and law school graduates (my profile, and perhaps that of the ALJ).  However, the case turns on medical standards and the meaning of medical language; and in that context, the ALJ asks the adjective "stable" to bear too great a burden.

In *Borgos-Hansen*, a systemic lupus case, the ALJ's decision denying benefits contained repeated references to the treating physician's "notations that on the occasion of one examination or another, Borgos-Hansen was 'doing well' or 'doing well overall.'"  109 F. Supp.3d at 527.  I held that this phraseology was not dispositive on the issue of disability *vel non*: "Such a generalized description of a patient, while reassuring and favorable as far as it goes, does not preclude a finding that the patient is disabled by a listed impairment."  *Id.*; *see also Vasquez v. Barnhart*, No. 02-cv-6751, 2004 WL 725322 (E.D.N.Y. Mar. 2, 2004) , where the district judge makes the same sensible

16

point: "Nor does the fact that this chronic, incurable condition [lupus] was characterized as 'stable' mean that it cannot constitute a disability under the Listing, as defendant suggests." *Id.*, at *9.

 To this district judge's lay eyes, a physician's notation that upon examination a patient's condition is "stable" means that at that time the condition is neither worsening nor improving: it has been *stabilized*. This says little if anything about the severity of the patient's symptoms, and nothing at all about whether the symptoms or effect of the condition render the patient *disabled*. The patient may be disabled; she may not be; the answer depends upon the nature and severity of the condition's symptoms, not upon whether at a given moment those symptoms are stable. But assuming *arguendo* that there is a medical  inconsistency between Dr. Teiger's notation in his August 26, 2010 progress note that Thornton's "lupus is stable" on the one hand, and his answers to the questionnaire  on February 20, 2012 that Thornton was disabled by lupus symptoms on the other hand, this is an appropriate area for inquiry by the ALJ when she interviews Dr. Teiger on remand. The notation that Thornton's lupus condition was "stable" does not do away with the necessity for a remand to explore whether Thornton was "disabled" by that condition  – on the contrary, any inconsistency between the two recitations reinforces that necessity for a remand.

 *Second*:  As previously discussed in this Ruling, a remand in the case is required because the ALJ erred when she disregarded the treating physician's opinion on the ground that the medical records did not contain what the ALJ thought they should if the physician's opinion was supportable. The ALJ may be right; she will pursue the subject with Dr. Teiger on remand.  But a remand is necessary, even though the ALJ's decision gave other reasons for rejecting Dr. Teiger's opinion.

 One reason the ALJ gave related to Thornton's vision.  Dr. Teiger's answers to the February 20, 2012 questionnaire opined that Thornton's vision was impaired by lupus.  Boxes are checked

which indicate a degree of visual impairment, and Dr. Teiger's handwritten notation in that section

says:  "vision impaired due to lupus retinitis."  A.R. 329.  In rejecting that limitation, the ALJ said

in her decision that she

> affords great weight to treating opthalmologist Dr. Barry Kels, who found that the claimant did not present with a vision loss that impacted her work related abilities.  Unlike Dr. Teiger, Dr. Kels has expertise in the field of ophthalmology and is adequately qualified to make an assessment of the claimant's visual abilities and is adequately qualified to make an assessment of the claimant's visual abilities and limitations, which render his opinion more persuasive.

A.R. 21.

With all due respect, it is something of a stretch for the ALJ to describe Dr. Kels as a

"*treating* ophthalmologist."   The record shows that Thornton was referred to Dr. Kels for

"ophthalmologic consultation" by Raymond Allard, a State of Connecticut vocational disability

examiner.  Dr. Kels examined Thornton at his office in Hartford on February 4, 2010, and sent a

written report to Allard dated October 14, 2010, A.R. 311-312.  The February 4, 2010 examination

was the only time Dr. Kels saw Thornton; she failed to appear for a suggested follow-up visit.  Dr.

Kels reported to the State examiner that as of February 4, 2010, Thornton "exhibits established SLE

absent any ocular sequela to the prescribed Plaquenil therapy [a lupus medication]", and "did not

display an absolute, cognizable opthalmologic-related inability" to perform work activities.

Dr. Teiger's description of a lupus-caused visual impairment afflicting Thornton appears in

his answers to the questionnaire dated February 20, 2012, just over two years after Dr. Kels

examined her.  Implicit in the ALJ's statement that Dr. Kels's opinion is "more persuasive" than Dr.

Teiger's is the notion that both physicians examined Thornton at or about the same time.  However,

Dr. Teiger's opinion is two years later than that of Dr. Kels.  The SSA Regulations, quoted *supra*,

18

describe lupus (or SLE) as "a chronic inflammatory disease that can affect any body or system."  A chronic disease afflicts  the sufferer over seemingly endless lengths of time.  Dr. Kels's report to Examiner Allard recites that Thornton was referred to his office "for complete ophthalmologic consultation in light of established SLE being treated with Plaquenil," A.R. 311, which at least suggests that lupus can affect the visual system.  As of his February 4, 2010 examination of Thornton, Dr. Kels opined that she did not have any lupus-related, work-activity limiting visual symptoms.  As of his February 20, 2012 answers to the questionnaire, Dr. Teiger opined that Thornton had work-activity limiting visual limitations ascribable to "lupus retinitis."

The question that occurs to this lay mind is whether Thornton  might have developed a visual impairment caused by lupus which was not apparent to Dr. Kels during his sole examination of Thornton in 2010, but became apparent to Dr. Teiger by 2012, during the course of his succeeding two-year treatment of this patient.  To be sure, as the ALJ stresses, Dr. Kels, an M.D., is an ophthalmologist and Dr. Teiger is not.  But Dr. Teiger is also an M.D., and may be competent – I put it no higher than that – to observe that Thornton had acquired a visual impairment and form a clinical opinion as to its cause.  Dr. Teiger expressed the medical opinion that as of February 20, 2012, Thornton had a visual impairment caused by lupus.

In view of the differing circumstances surrounding the expression of these seemingly different medical opinions, with the attendant possibility that Thornton acquired a lupus-related visual impairment over time, it was incumbent upon the ALJ to explore that possibility, in performance of the ALJ's duty to "investigate the facts and develop the arguments both for and against granting benefits," *Sims*, 530 U.S. 111.  That investigation would take the form of asking Dr. Teiger, whose claim to the status of "treating physician" is stronger than that of Dr. Kels, about his

finding of an activity-impeding visual impairment caused by lupus, in the context of Dr. Kels's earlier prior finding to the contrary.

In any event, however, the case does not turn upon whether, at the time of her application for disability benefits, Thornton had a *visual* impairment caused by lupus.  That is because Dr. Teiger's opinions, as expressed in the February 20, 2012 questionnaire he completed (AR. 326-331), may be read as identifying as the principal cause of Thornton's disability *non-visual* impairments caused by joint pain, a classic symptom of lupus.

The questionnaire asks the physician to assess the patient's limitations in several categories of physical activities, and indicate "the particular medical or clinical findings" that support any assessed limitations.    Dr. Teiger reported marked limitations in the categories of "LIFTING/CARRYING" and "SITTING/STANDING/WALKING."  The causative findings are identified in a handwritten notation as "defined systemic lupus & arthritis."[3]  Severe limitations are reported for "USE OF HANDS" – followed by the notation "frequent hand pain and numbness." Somewhat less severe limitations are reported for "USE OF FEET" – followed by the notation "not (illegible) due to leg pain."   Severe limitations are reported for each of a list of "POSTURAL ACTIVITIES" – followed by the notation "All pain related disability." Some limitations are reported in the category of "HEARING OR VISION" – followed by the notation, quoted *supra*, "vision impaired due to lupus retinitis."  The final category of "ENVIRONMENTAL  LIMITATIONS" reports severe limitations on the patient's ability to tolerate exposure to several conditions of the environment – followed by the notation "patient limited due to her lupus symptoms.  Primarily vision

---

[3]  I believe the last word in this notation to be "arthritis," although the handwriting is not as clear as with the earlier words.  The phrase "systemic lupus" is entirely legible.

& joint pain." Dr. Teiger's references to pain do not in any way contradict Dr. Kels's ophthalmologic findings, which were not concerned with that area.

Two areas of uncertainty with respect to the treating physician's opinion emerge from these medical records: (1) Does Dr. Teiger adhere to his opinion that Thornton had an impairment of vision caused by her underlying lupus condition?  (2) Assuming that lupus did not cause a limitation of vision, was Thornton's non-visual pain, joint or otherwise, of sufficient severity to render her disabled?  Until these questions are resolved by further inquiries addressed to Dr. Teiger, the Court is not in a position to decide whether the Commissioner's decision of non-disability should be accepted or rejected on judicial review.

**V**

**CONCLUSION**

A remand to the Commissioner is necessary in this case because there is a gap in the administrative record.  That gap relates to the reasons the ALJ gave for disregarding the opinion of the Plaintiff's treating physician that Plaintiff was disabled.

A need to further develop the record is not presented by every case where the Social Security Administration denies benefits.  "Where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa*, 168 F.3d at 79 n.5 (citation and internal quotation marks omitted).  However, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or . . . by a paralegal."  *Id.*, at 79 (internal quotation omitted).

In the case at bar, the deficiency in the record results from the ALJ's choosing to reject the medical opinion of Dr. Teiger, a competent treating physician, because in the ALJ's non-professional view the medical records did not support the treating physician's opinion that Thornton was disabled. Since that reasoning on the part of the ALJ contravened Second Circuit authority, this Court cannot regard it as a "good reason" for giving the treating physician's opinion no weight, as that phrase is used in the SSA Regulations.

Moreover, the ALJ's express and specific reliance upon this perceived inadequacy in the medical records permeates the denial of benefits in this case and requires a remand, notwithstanding the fact that the ALJ gave other reasons for disregarding Dr. Teiger's opinion that Thornton was disabled by lupus. The ALJ's preferring Dr. Kels's earlier ophthalmological opinion as the ground for rejecting Dr. Teiger's later and broadly stated medical opinion is problematic, for the reasons stated *supra*. The ALJ's decision gives other reasons for giving Dr. Teiger's opinion no weight, but they do not cure the problem created by the ALJ's lay, pervasive and impermissible conclusion that the medical records in the case do not adequately support the treating physician's medical opinion that Thornton was disabled.

The justice of the cause, as informed by Second Circuit decisions, requires that the case be remanded to the Commissioner, with the direction that the ALJ interview Dr. Teiger with respect to his opinion that Thornton is disabled by lupus, and conduct such further investigation as the ALJ may think appropriate, given the contents of this Ruling.

For the foregoing reasons, the motion [Doc. 11] of the Plaintiff for an order reversing or remanding the decision of the Defendant Commissioner is GRANTED IN PART and DENIED IN PART. The motion is granted to the extent that the Court remands this case to the Commissioner

for further proceedings consistent with this Ruling.

The cross-motion [Doc. 17] of the Defendant Commissioner for an order affirming the Commissioner's decision denying Plaintiff benefits is DENIED.

The Clerk is directed to close the case.

It is SO ORDERED.

Dated:  New Haven, Connecticut
         February 9, 2016


*/s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge